**Irving A. GELB, Plaintiff,**

v.

**The BOARD OF ELECTIONS IN THE CITY OF NEW YORK, Individually, Commissioners Weyman A. Carey, Michael J. Cilmi, Michael L. Cohen, Ronald J. D'Angelo, Douglas A. Kellner, Crystal N. Paris, Gertrude Strohm, Frederic M. Umane, Vincent J. Velella, Stephen H. Weiner, Executive Director Daniel De Francesco, Deputy Executive Director Margaret Ognibene, Administrative Manager Jon R. Del Giorno, Defendants.**

No. 97 Civ. 9404 (RMB).

United States District Court,
S.D. New York.

Sept. 30, 1999.

---

Irving A. Gelb, Bronx, NY, pro se.

Paul F. Marks, Michael D. Hess, Corporation Counsel of New York, New York City, for Defendants.

## ORDER

BERMAN, District Judge.

The issue at bar is whether Plaintiff Irving A. Gelb's ("Plaintiff" or "Gelb") current case against Defendants, the Board of Elections in the City of New York ("Board") and individual Board members and employees, is sufficiently different, factually and/or legally, from Mr. Gelb's 1994 case (*"Gelb I"*) against essentially the same defendants to warrant a different outcome.[1] *See Gelb v. Board of Elections in the City of New York,* 950 F.Supp. 82 (S.D.N.Y.1996) (dismissing Plaintiff's due process and equal protection claims on summary judgment), *aff'd.* 125 F.3d 843 (2d Cir.1997). The Court here concludes that the two cases warrant the same result. **For the reasons set forth below, Plaintiff Gelb's motions for summary judgment (filed December 10, 1998 and January 11, 1999)[2] are denied, and Defendants' cross-motion for summary judgment (dated December 31, 1998 and filed January 14, 1999) is granted.**

## I. *Background*

In the Fall of 1993, Mr. Gelb ran (unsuccessfully) as a write-in candidate for the office of Bronx Borough President. He was able to vote by writing-in his name in the general election. On January 3, 1994, Mr. Gelb, appearing pro se, commenced an action in this Court, seeking injunctive relief and compensatory and punitive damages based upon the Board's alleged violation of his right to cast a write-in vote and to be a write-in candidate.[3] *Gelb I* was premised upon rights presumably secured to him by the First and Fourteenth

---

1. Mr. Gelb's complaint in *Gelb I* named as defendants the Board and its ten Commissioners. His complaint in the instant action names as defendants the Board and its ten Commissioners, plus its Executive Director, Deputy Executive Director, and Administrative Manager.

   Both cases are based upon Plaintiff Gelb's efforts to be elected to the Office of Bronx Borough President. In both cases, Mr. Gelb has claimed injury to his Constitutional rights resulting from the Board's write-in candidacy voting procedures. In *Gelb I*, Plaintiff objected to the fact that the Board did not provide write-in voting in the 1993 Democratic Party primary election for Bronx Borough President and did not provide written or visual write-in voting instructions at the polls in the 1993 general election for Bronx Borough President. The instant complaint identifies the same (alleged) deficiencies regarding the 1997 Democratic Party primary and general elections for Bronx Borough President and also challenges related write-in voting procedures.

2. Plaintiff's "second motion", filed on January 11, 1999, is essentially an addendum and continuation of his first motion, filed on December 10, 1998.

3. Gelb sought $10,000,000.00 from the Board and $100,000.00 from each of ten individual Board member defendants. (*Gelb I* Final Am. Compl. at 4.)

Amendments of the United States Constitution as well as various provisions of the New York State Election Law ("NYEL").[4] Early on in *Gelb I*, Judge Sotomayor denied the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). However, following the filing of cross-motions for summary judgment, Judge Sotomayor rejected Mr. Gelb's Federal claims and declined to exercise supplemental jurisdiction over any remaining state law claims. Relying in substantial part upon *Powell v. Power*, 436 F.2d 84 (2d Cir.1970), Judge Sotomayor noted "that not every voting irregularity arises to the level of a federal constitutional violation" and "that it [is] not within the province of the federal judiciary to micro-manage the details of local elections." *Gelb*, 950 F.Supp. at 84. Judge Sotomayor quoted the following cautionary passage from *Powell* which is also applicable here:

> Were we to embrace plaintiff's theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law. Absent a clear and unambiguous mandate from Congress, we are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts.

*Id.* (quoting *Powell* at 86).

In view of Mr. Gelb's failure, in *Gelb I*, to provide any evidence that the Board's actions "had any impact on the outcome of either election" and in light of the availability of adequate remedies under state law, particularly New York Election Law §§ 16–102 and 106, Judge Sotomayor concluded that none of the Board's actions "rendered either the primary or the general election so pervasively unfair as to require a federal remedy under the due process clause." *See id.* at 85–86. Judge Sotomayor likewise rejected Mr. Gelb's equal protection claim because he had produced "no evidence of intentional discrimination." *See id.* at 86. "[T]he election process errors about which [Mr. Gelb] complain[ed] were the sort of minutiae that the Second Circuit in *Powell* cautioned the federal courts from overseeing . . ." *Id.*

On appeal, the U.S. Court of Appeals for the Second Circuit affirmed Judge Sotomayor's ruling in *Gelb I* "for substantially

---

**4.** (Then) District Court Judge Sonia Sotomayor, in dismissing *Gelb I*, noted that "Gelb [was] not challenging the constitutionality of any provision of the NYEL. Rather Gelb allege[d] that defendants violated the law as set forth in the NYEL in order to undermine write-in candidacies." *Gelb v. Board of Elections in the City of New York*, 888 F.Supp. 509, 513 (S.D.N.Y.1995).

With regard to the 1993 Democratic Party primary election for Bronx Borough President, Gelb had claimed: (1) that sample ballots violated NYEL § 7–118 (which requires that sample ballots contain "suitable illustrated directions for voting on the voting machine"); (2) that absentee ballots violated NYEL § 7–122(1) (which requires that ballots contain "blank spaces for writing in names of persons not printed on the ballot" and write-in instructions); (3) that ballots in the voting booths violated NYEL § 7–114(2)(g) (which provides that "spaces containing names of candidates and for writing in names . . . shall be separated by light horizontal lines"); (4) that the defendants violated NYEL § 7–202(1) (which requires that voting machines "permit voting in absolute secrecy"). *See id.* at 511–13. With regard to the 1993 general election for Bronx Borough President, Gelb claimed: (1) that sample ballots violated NYEL § 7–118 by not showing the write-in column or referring to it in the instructions; (2) that display cards in the voting booths were "incomplete and therefore discriminatory" because they did not provide write-in instructions; and (3) that the defendants violated NYEL § 7–202(1) by failing to place pencils within the voting booths. *See id.* at 513. Gelb also asserted that by virtue of the defendant Commissioners' alleged NYEL violations, they were guilty of numerous criminal felonies. *See id.*

Noting that "Gelb [did] not specifically identify the federal statute underlying his cause of action, [Judge Sotomayor treated] his complaint as one brought pursuant to 42 U.S.C. § 1983." *Id.* at 514.

the reasons stated by the district court." *See Gelb*, 125 F.3d at 843. The Court of Appeals also observed: "where ... there exists a state law remedy to the election irregularities that is fair and adequate, human error in the conduct of elections does not rise to the level of a Fourteenth Amendment constitutional violation actionable under § 1983 in the absence of willful action by state officials." *Id.* (quoting *Gold v. Feinberg*, 101 F.3d 796, 802 (2d Cir.1996)),

### Gelb II

Again, in the Fall 1997, Plaintiff Gelb ran unsuccessfully in the race for Bronx Borough President. Again in 1997, he was able to write-in his own name in the general election. After the election, Gelb, appearing pro se, filed the instant complaint in this Court (initially before Judge Harold Baer, Jr.)[5] seeking injunctive relief and damages pursuant to 42 U.S.C. § 1983 based upon the defendants' alleged violation of his right to cast a write-in vote and to be a write-in candidate ("*Gelb II* ").[6] As in *Gelb I*, Plaintiff "does not challenge any state law, but rather the [alleged] misconduct under color of law by the defendants." (*Gelb II* Pl.'s Mot. for Summ.J. Reply at 8.) The factual claims set forth in

Plaintiff's instant complaint are virtually identical to those set forth in his prior complaint. Plaintiff Gelb has once again alleged, among other things, that the Board did not provide the (adequate) means to cast a write-in vote in the 1997 Democratic Party primary election for Bronx Borough President and that the Board failed to provide adequate write-in voting instructions in the subsequent general election for Bronx Borough President.[7] In the instant complaint, Gelb also asserts that the Board's protested conduct occurred, not only in the 1997 elections in which he sought to participate as a candidate, but also in a series of prior elections in which he did not seek to be elected.[8]

On March 5, 1998, Defendants moved to dismiss the *Gelb II* complaint on the grounds of collateral estoppel and failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6): Judge Baer denied the motion to dismiss (as Judge Sotomayor had done in *Gelb I* ), determining that:

> the issues in this case are not identical to the issues in *Gelb I* . . . . The claims in *Gelb I* solely concerned the 1993 election, while the claims here allege a pat-

---

5. The action was transferred to the undersigned on or about December 8, 1998.

6. Gelb seeks $10,000,000.00 from the Board. (*Gelb II* Compl. at 7.) From each of the thirteen individual defendants, Gelb seeks an additional $200,000.00. (*Id.*)

7. With regard to the 1997 Democratic Party primary election for Bronx Borough President, Gelb claims: (1) that sample ballots violated NYEL § 7–118 by not providing write-in voting instructions; (2) that absentee ballots violated NYEL §§ 7–114 and 7–122(1) by not providing write-in spaces or instructions; (3) that Defendants violated NYEL § 6–164 (which provides that "[u]pon the receipt of [an opportunity to ballot petition signed by the requisite number of party voters requesting an opportunity to write in the name of a candidate], such office or position shall be deemed contested and the primary ballots of the party shall afford an opportunity to vote thereon") and NYEL § 9–102(2) (which provides that the "chairman of the board of in-

spectors shall ... read ... the result as shown by the counter number, and then shall read the votes recorded for each office on the write-in ballots"); and (4) that Defendants deliberately committed these alleged violations of NYEL. (*Gelb II* Compl. at 2–4.) **As discussed at pages 9 and 10 above, no (valid) opportunity to ballot petition(s) were filed by Plaintiff in the 1997 primary for Bronx Borough President.**

With regard to the 1997 general election for Bronx Borough President, Gelb claims: (1) that sample ballots violated NYEL § 7–118 by not providing write-in voting instructions; (2) that instructions provided in the voting booths were "clearly discriminatory" because they did not include write-in instructions; and (3) that Defendants violated § 9–102(2) by not counting write-in votes immediately at the polls. (*Id.* at 4–6.)

8. Gelb asserts that write-in violations also occurred in primary and general elections held in 1996, 1995, 1994, and 1993, (*Gelb II* Compl. at 2–5).

tern of repeated violations leading up to and including the primary and general elections of 1997. Accordingly, the issues in the two cases are not identical. *Gelb v. Board of Elections of the City of New York,* 1998 WL 386440 at *2 (S.D.N.Y.,1998).

On August 20, 1998, Gelb filed a motion "for an order pursuant to Rule 65 of the Federal Rules of Civil Procedure granting a Mandatory Injunction, beginning with the September 15, 1998 Primary, prohibiting the defendants from refusing to allow write-in voting in contested primaries and requiring that all sample ballots, posted instructions and illustrations include the manner in which the write-in vote is to be cast." (Gelb Notice of Motion for Mandatory Injunction, dated August 20, 1998). By Order dated October 2, 1998, Judge Baer held that due to "the lack of proof of any irreparable harm and untold technical difficulties for the Board ... plaintiff's motion for a preliminary injunction is denied." (Baer Order, dated October 2, 1998).

On October 19, 1998, Gelb filed a second motion for "Mandatory Injunction" pursuant to Fed.R.Civ.P. 65. This second motion for injunctive relief was substantially similar to the one he had filed on August 20, 1998, except that it applied to "all contested primaries following the September 15, 1998 Primary ..." (Gelb Notice of Motion for Mandatory Injunction, dated

October 19, 1998). By Order dated November 11, 1998, Judge Baer directed "the Clerk to strike the motion for a permanent injunction." Plaintiff was, however, permitted to file a motion for summary judgment. (Baer Order, dated November 11, 1998).[9]

Gelb filed the instant motions for summary judgment on December 10, 1998 and January 11, 1999.[10] The Defendants filed a Cross–Motion for Summary Judgment on January 14, 1999.

## II. *Analysis*

Fed.R.Civ.P. 56(c) provides that a motion for summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, in order to preclude summary judgment, remaining factual issues must be both genuine (meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party") and material (meaning that such issues "might affect the outcome of the suit under the governing law.") *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A motion for summary judgment places greater stress on a nonmoving party's case than a motion to dismiss. In considering a

**9.** It appears that Judge Baer treated Gelb's August 20, 1998 motion as one seeking a preliminary injunction and Gelb's October 19, 1998 motion as one seeking a permanent injunction.

**10.** In his first motion for summary judgment herein, dated December 10, 1998 and addressed to Judge Baer, Plaintiff seeks the following relief: (1) provision of write-in voting in all future contested elections; (2) labeling of the write-in column on all voting machines, absentee ballots, paper ballots, sample ballots, and illustrations representing the contents of the ballot; (3) that all voting machine instructions at the polls explain the manner in which a write-in vote is to be cast; and (4) that

write-in votes be counted at the polls at the close of voting.

In his second motion herein, dated January 11, 1999 and addressed to the undersigned, Plaintiff includes a "Reply Part 'a' of Defendants' [Local] Rule 56.1 Statement," copies of evidentiary exhibits submitted with his first motion, and additional evidentiary exhibits. In deciding the parties' motions, the Court has considered all materials submitted by the *pro se* Plaintiff. *See Shepherd v. Fraisher,* 1999 WL 713839 at *2 ("although the same standards for summary judgment apply when a pro se litigant is involved, the pro se litigant 'should be given special latitude in responding to a summary judgment motion.' ") (citation omitted.)

Fed.R.Civ.P. 12(b)(6) motion to dismiss, the Court is required to "accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *See Sheppard v. Beerman*, 18 F.3d 147 (2d Cir.1994) (internal citations and quotations omitted).[11] Upon a motion for summary judgment, however, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson* at 249–50, 106 S.Ct. 2505 (internal citations omitted).

Here, both Plaintiff and Defendants have moved for summary judgment. "On cross-motions for summary judgment, the standard is the same as that for individual motions for summary judgment and the court must consider each motion indepen-

**11.** As noted, both Judge Sotomayor in *Gelb I* and Judge Baer in *Gelb II* resolved 12(b)(6) motions in favor of plaintiff. At the same time, Judge Sotomayor in *Gelb I* and this Court in *Gelb II* have concluded that summary judgment in favor of the defendants is warranted.

**12.** NYEL § 6–164 provides, in relevant part, that party voters "equal in number to at least the number of signers required to designate a candidate for such office or position [4000 with respect to Bronx Borough President, *see* New York Election Law § 6–136] may file ... a petition requesting an opportunity to write in the name of a candidate or candidates, who need not be specified, for such office or position. Upon the receipt of such a petition, such office or position shall be deemed contested and the primary ballots of the party shall afford an opportunity to vote thereon."

dent of the other." *Gelb*, 950 F.Supp. at 83 (quoting *Aviall, Inc. v. Ryder System, Inc.*, 913 F.Supp. 826, 828 (S.D.N.Y.1996)) (citing *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993)).

## The Board's Write–In Procedures

The reasoning (legal basis) behind the Board's approach to write-in voting, in the 1997 Democratic Party primary for Bronx Borough President and in other elections, is explained in the Declaration of Daniel DeFrancesco, the Board's Executive Director, which is part of Defendants' motion herein. Mr. DeFrancesco states, and Plaintiff has not disputed, that the Board interprets New York Election Law § 6–164 to require writing-in balloting in a primary election **if and only if** a candidate has filed a valid "opportunity to ballot" petition.[12] (DeFrancesco Decl. ¶ 4.) Mr. DeFrancesco also states that no valid opportunity to ballot petitions were filed by or on behalf of plaintiff in the 1997 Democratic Party primary election for Bronx Borough President. (*Id.* ¶¶ 5, 7.) Plaintiff has offered no evidence to dispute this fact. Nor has Plaintiff offered evidence to dispute the fact that **where valid opportunity to ballot petitions have been filed (in 1997 and in other years), the Board has offered write-in voting.**[13]

**13.** In his Declaration, Mr. DeFrancesco also stated: "In 1997, valid opportunity to ballot petitions were filed in three primaries: (1) the Conservative Party primary for Member of the City Council from the 39th Council District in Kings County; (2) the Independence Party primary for Member of the City Council from the 39th Council District; and (3) the Independence Party primary for Member of City Council from the 20th Council District in Queens County. Therefore, write-in voting was offered in those primaries. No valid opportunity to ballot petition was filed in the 1997 Democratic Party primary election for Bronx Borough President Accordingly, write in voting was not offered in that primary election." (DeFrancesco Decl. ¶ 7.)

Likewise, in 1993, the Board offered write-in voting where "a valid opportunity to ballot petition was filed for the Republican Party primary election for District Attorney of Kings County," but not in the Democratic Party

Mr. DeFrancesco also stated that "[w]rite-in voting is offered in all general elections." (*Id.* ¶ 11.) Poll workers are "trained ... on write-in voting procedures and on how to assist voters who wish to cast write-in votes on a voting machine"; written write-in voting instructions are provided on absentee ballots.[14] (*Id.*) Write-in votes are counted at the same time the Board canvasses paper ballots, in part because "the paper roll on which the write-in votes are recorded would jam during the count." (*Id.* ¶¶ 13, 14.) Plaintiff has not disputed these facts.

It is difficult for this Court to perceive Mr. Gelb's grievance. He was not prevented (nor, apparently, was anyone else) from casting a write-in vote for himself in the 1993 or the 1997 general elections for Bronx Borough President. He was unable to cast write-in votes in the 1993 and 1997 primaries—but, in this, he was in no different position from anyone else in New York City who failed to submit opportunity to ballot petitions. He has (already) had his "day" in Federal Court. *See Gelb,* 950 F.Supp. 82. Despite the availability and adequacy of state court mechanisms to air any remaining electoral challenges he may have, he has chosen, rather, to bring *Gelb I* all over again in this forum.

■ ·Not only is it inappropriate for the Court here to involve itself in the details of New York State electoral processes, *see Powell v. Power,* 436 F.2d 84 (2d Cir.1970), but it is even unclear whether Mr. Gelb has a constitutionally protected "write-in" option. In upholding Hawaii's (absolute) ban on write-in voting, the U.S. Supreme Court has explained:

> [T]he function of the election process is "to winnow out and finally reject all but the chosen candidates," not to provide a means of giving vent to "short-range political goals, pique, or personal quarrel[s]." Attributing to elections a more generalized expressive function would undermine the ability of states to operate elections fairly and efficiently.
>
> Accordingly, we have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls.... **And there is nothing content based about a flat ban on all forms of write-in ballots.**

*Burdick v. Takushi,* 504 U.S. 428, 438, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (internal citations omitted and emphasis added).[15] Reasonable state requirements that candidates evidence a "significant modicum of support" in order to appear on the ballot have been upheld by the Supreme Court. *See Jenness v. Fortson,* 403 U.S. 431, 440, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (holding a five percent signature

---

primary election for Bronx Borough President because no valid opportunity to ballot petition was filed. (*Id.* ¶ 5.) "In 1998, valid petitions for an opportunity to ballot were filed in nine primaries," and "[w]rite-in voting was offered in those primaries." (*Id.* ¶ 8.)

In the supporting papers filed with his motions for summary judgment, Plaintiff offers evidence that voters in Nassau County and Rockland County were offered write-in voting in 1998 primary elections for U.S. Senate and various New York State offices. (Pl.'s Aff. in Support of Mot. at 3.) Plaintiff has failed to establish the relevance of this material to the injuries he allegedly suffered by the actions of Defendants here, who have responsibility for New York City elections only. The statewide comparison offered by Plaintiff does, however, lend support for the proposition that Plaintiff's election claims should be pursued

in the New York State Supreme Court under NYEL §§ 16–102.

**14.** In 1998, the Board added written write-in voting instructions to general election ballots. (DeFrancesco Dec. ¶ 11.)

**15.** The Supreme Court has also stated that: "when a State's ballot access laws pass constitutional muster as imposing only reasonable burdens on First and Fourteenth Amendment rights ... prohibition on write-in voting will be presumptively valid, since any burden on the right to vote for the candidate of one's choice will be light and normally will be counterbalanced by the very state interests supporting the ballot access scheme [*e.g.* the State's interest in avoiding "unrestrained factionalism"]." *Burdick,* 504 U.S. at 439, 441, 112 S.Ct. 2059.

requirement to be constitutional). In *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), the Supreme Court stated that:

> Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.' 'In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.'
>
> States have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections. . . .

*Id.* at 963–65, 102 S.Ct. 2836 (internal citations omitted).

New York Election Law § 7–114(1)(b) provides a mechanism for Mr. Gelb and others to write-in their names on primary ballots. "[U]nder each [office or party position] title shall be printed the names of the designated candidates for the office or position." Section 6–136(2) sets out the requirements for designation:

> [Designating] petitions must be signed by not less than five per centrum, as determined by the preceding enrollment of the then enrolled voters of the party residing within the political unit in which the office or position is to be voted for (excluding voters in inactive status), provided, however, that for the following public offices the number of signatures need not exceed the following limits: . . . (b) For any office not be filled by all the voters of any county or borough within the city of New York, four thousand signatures. . . .

In *Prestia v. O'Connor,* 178 F.3d 86 (2d Cir.1999), the U.S. Court of Appeals for the Second Circuit affirmed the constitutionality of New York Election Law § 6–136(2) in the face of a challenge brought by voters whose write-in balloting petition (for the Conservative Party primary election for U.S. House of Representatives from New York's 7th Congressional District) had been rejected for failure to meet the signature requirement. *See id.* at 87–88. The Court invoked "the general rule that a ballot access requirement of signatures from five percent of the relevant voter group ordinarily does not violate constitutional rights." *Id.* at 87. With regard to the plaintiffs' lack of opportunity to vote by write-in, the Court stated that:

> [T]he absence of a write-in opportunity does not significantly burden voters' rights where, as here, voters have an opportunity to petition for the placement of specific candidates on the ballot. **Indeed, if adequate ballot access is provided, it is constitutionally permissible for states to prohibit write-in voting altogether.**

*See id.* at 88 n. 1 (citing *Burdick,* 504 U.S. at 438–40, 112 S.Ct. 2059) (emphasis added).

### Gelb's Due Process Claim

In *Powell v. Power, supra,* the U.S. Court of Appeals affirmed the District Court's denial of relief to voters who had claimed that the outcome of the 1970 Democratic Party primary election in New York's 18th Congressional District would have been different if unqualified voters had not (inadvertently) been permitted to cast ballots.[16] The Court of Appeals concluded that:

> the due process clause . . . offer[s] no guarantee against errors in the administration of an election. New York Election Law §§ 145, 330(2) [now §§ 6–154,

---

16. "[S]tate officials neglected to remove all the non-Democratic registration cards from the locked binders used at the polls, and a number of non-Democrats cast their votes in the primary election. *Powell,* 436 F.2d at 86.

The parties . . . stipulated that 1,232 unqualified voters cast their ballots and that [the winning candidate's] margin of victory was 150." *Id.* at 86 n. 2. (emphasis added.)

16–102] provide a method for correcting such errors as are made.... [W]e cannot believe that the framers of our Constitution were so hypersensitive to ordinary human frailties as to lay down an unrealistic requirement that elections be free of any error.

*Powell,* 436 F.2d at 88. In *Gold v. Feinberg,* 101 F.3d 796 (2d Cir.1996), the Court reaffirmed the principle that the Due Process Clause " 'offer[s] no guarantee against errors in the administration of an election,' at least where state law provides a fair and adequate method for correcting such errors." *Id.* at 800.

■ In order to sustain a Federal due process challenge, Plaintiff would have to show that the Board's policies rendered the 1997 election(s) for Bronx Borough President "pervasively unfair." *See Ladner v. City of New York,* 20 F.Supp.2d 509, 515 (E.D.N.Y.1998); *Gelb,* 950 F.Supp. at 85; *Cornett v. Sheldon,* 894 F.Supp. 715, 727 (S.D.N.Y.1995); *Denis v. New York City Board of Elections,* 1994 WL 613330, *3 (S.D.N.Y.1994); *see also Gold,* 101 F.3d at 801; *Powell,* 436 F.2d at 88. He has not done so. Indeed, Plaintiff has offered no evidence that the Board's challenged procedures prevented any voter—including himself—from casting a write-in vote, much less, that they had any adverse impact upon the outcome of the 1997 elections. *See Gelb,* 950 F.Supp. at 85; *Donohue v. Board of Elections of the State of New York,* 435 F.Supp. 957, 968 (E.D.N.Y. 1976) ("[I]n judging whether the complaint before us states a claim upon which relief can be granted, the plaintiffs must allege, and be prepared to prove ... the fraud or other unlawful behavior changed the outcome of the election.") Nor has Plaintiff offered evidence that the 1997 elections were conducted differently than the 1993 elections, which were determined to be constitutionally appropriate in *Gelb I.*

Perhaps most importantly, New York Election Law, specifically §§ 16–102, 16–104, and 16–106,[17] offers Plaintiff an adequate state law remedy—a clearly established mechanism and framework for airing his electoral grievances. *See Gold,* 101 F.3d at 802 (determining that NYEL § 16–102(3) offers a "fair and adequate remedy for the challenged primary irregularities"); *Powell,* 436 F.2d at 88; *Gelb,* 950 F.Supp. at 85–86 ("Plaintiff could have availed himself of New York's 'comprehensive and expeditious process for adjudicating election law disputes' by challenging the primary election under New York Election Law § 16–102 and the general election under New York Election Law § 16–106...."). Plaintiff has not availed himself of these remedies as he should, nor has he (even), in *Gelb II,* questioned the adequacy of these state law provisions. For these reasons, among others, the alleged election process "irregularities" at issue do not rise to the level of a Federal due process violation.

### Equal Protection Claim

■ The equal protection principles applied in *Gelb I* are equally valid in *Gelb II.* A showing of "willful action by state officials intended to deprive individuals of

---

**17.** § 16–102 provides: "[T]he election of any person to any party position may be contested in a proceeding instituted in the supreme court by any aggrieved candidate.... The court may direct ... the holding of a new primary election ... where it finds there has been such fraud or irregularity as to render impossible a determination as to who rightfully was ... elected."

§ 16–104 provides: "The form and content of any ballot, or portion thereof, to be used in an election ... may be contested in a proceeding instituted in the supreme court by any aggrieved candidate...."

§ 16–106 provides: "The casting or canvassing or refusal to cast challenged ballots ... may be contested in a proceeding instituted in the supreme or county court, by any candidate ... and by any voter with respect to the refusal to cast such voter's ballot.... The canvass of returns by the ... city ... board of canvassers may be contested, in a proceeding instituted in the supreme court by any voter.... The court may direct a recanvass or the correction of an error, or the performance of any duty imposed by law on such ... city ... board of inspectors, or canvassers."

their constitutional right to vote" is required to prove a Federal equal protection violation stemming from a state election. *See Gold,* 101 F.3d at 802; *Powell,* 436 F.2d at 88; *Donohue,* 435 F.Supp. at 968 (stating that plaintiffs must prove "the fraud or other unlawful behavior was committed with the intent or purpose of depriving qualified voters of their constitutionally protected right to vote").[18]

▮ Plaintiff has offered no evidence of Defendants' intent to deprive him of his right to vote by write-in ballot or to be a write-in candidate. Indeed, the evidence that has been submitted points in the opposite direction. Plaintiff has not disputed the Board's contention that it has offered write-in voting in all general elections; Plaintiff concedes that he was able to cast a write-in vote for himself in both the 1997 and 1993 general elections for Bronx Borough President, (Gelb Dep. at 27, 32). And, Plaintiff concedes, the Board offers write-in voting in primary elections where valid opportunity to ballot petition have been filed pursuant to New York State Election Law. The fact that the Board has continued to apply its (legal) interpretation of New York Election Law § 6–164 despite Plaintiff's protestations in *Gelb I* demonstrates, perhaps, that the Board's

actions were not the result of inadvertence.[19] It does not make them illegal. Mere willfulness, without the specific intent to deprive Plaintiff of a fundamental right, is insufficient to establish an Equal Protection claim. *See Gold,* 101 F.3d at 801–02.

In *Gold,* the Court of Appeals confirmed that a § 1983 action to remedy errors in the election process allegedly violating the equal protection clause cannot be sustained unless the state action constituted "intentional or purposeful discrimination." *See Gold,* 101 F.3d at 800. The plaintiffs in *Gold* claimed that they were deprived of their right to vote in the 1996 Democratic Party Surrogate primary election in Kings County, New York because, it was asserted, the Board's practices and policies resulted in the late arrival of voting machines and paper ballots at the polls, and mechanical oversights in servicing voting machines caused thousands of "votes previously cast [to be] deleted and others cast for one candidate [to be] effectively 'switched' to another candidate." *See id.* at 798–99. The Court rejected the District Court's conclusion that, despite the absence of evidence tending to show intent to discriminate, "certain longstanding practices of the Elections Board ... constituted willfulness within the meaning of the

18. "Although Gelb suggests that some kind of animus toward write-in candidates or voters might be inferred from the Board's failure to instruct voters on write-in procedures, we note that were we to accept this inference in the absence of any facts supporting it other than the fact that the alleged irregularities occurred in the first instance, we would seriously undermine the requirement that a plaintiff show 'intentional and purposeful discrimination' to the extent that such an inference always could be drawn in any case in which voting irregularities are alleged." *Gelb,* 125 F.3d at 843.

In *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), the U.S. Supreme Court affirmed dismissal of a claim brought by an unsuccessful candidate for a Republican Party nomination in the Third Senatorial District of Illinois. The plaintiff claimed that he had been deprived of Federal equal protection by members of the State Primary Can-

vassing Board, who allegedly 'willfully, maliciously and arbitrarily' refused to certify the plaintiff as a Republican nominee. *See id.* at 4, 64 S.Ct. 397. The Supreme Court held that the "illegality [of official action] under [a] state statute can neither add to nor subtract from its constitutional validity. Mere violation of a state statute does not infringe the federal Constitution." *Id.* at 11, 64 S.Ct. 397.

19. Neither Judge Sotomayor, in 1996, nor the Court of Appeals, in 1997, determined whether the Board's interpretation was correct. The District Court even noted that "there is great uncertainty within state law as to whether a write-in option must be provided in a primary election." *Gelb,* 950 F.Supp. at 85 n. 3. *Gelb,* 950 F.Supp. at 86–87 ("Having found that there is no federal constitutional violation and therefore no basis for federal intervention in this case," the Court "relinquish[ed] jurisdiction over plaintiff's state law claims to the appropriate state forum.")

civil rights law." *See id.* at 801. It held that the Board's longstanding practices did not constitute "the kind of official policy or custom, or the type of purposeful conduct, intended to deprive someone of the right to vote that is required to sustain a § 1983 claim under the Fourteenth Amendment." *Id.* at 802. The Court's conclusion is applicable here. The Board has offered substantial evidence that it does not discriminate against write-in voters. For these reasons, among others, Plaintiff's equal protection claim must fail.

#### State Law Claims

In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court emphasized that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 726, 86 S.Ct. 1130. Under *Gibbs,* a Federal court must consider the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case involving pendent state law claims. The Supreme Court in *Gibbs* went on to state that "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.; see also Rounseville v. Zahl,* 13 F.3d 625, 631 (2d Cir.1994) (holding that after summary judgment dismissal of federal claims, "[i]t would be an inappropriate exercise of pendent jurisdiction and a waste of federal judicial resources for the District Court to hold a trial on a purely state claim"); *DiLaura v. Power Authority,* 982 F.2d 73, 80 (2d Cir.1992) (quoting *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (" 'In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.' ")); 28 U.S.C. § 1367(c)(3) (codifying existing case law and giving District Courts discretion to decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction").

Here, as in *Gelb I,* because no Federal claims remain, Plaintiff's state law claims are dismissed. *See Gelb,* 950 F.Supp. at 86–87.

### III. Conclusion

For the reasons set forth above, Plaintiff's motions for summary judgment [Document Nos. 27–1 & 32–1] are denied, and Defendants' motion for summary judgment [Document No. 35–1] is granted. The Clerk is respectfully requested to enter an order dismissing the complaint.